1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| PAULETTE BECK, as Personal Representative of the ESTATE OF PIPER TRAVIS, deceased, and PAULETTE and GREGORY BECK, individually,<br><br>        Plaintiffs,<br><br>v.<br><br>SNOHOMISH COUNTY, a municipal corporation, TY TRENARY, MAGELLAN ANDERSON, EMERSON YABUT, CONNER SMITH, BIK-YEE URBAN, KARIN HEUSTED, JASON BURNS, HEALTH PROS NORTHWEST, INC, JEANNE DUNHAM, JOSEPH KING, and JOHN DOES 1–10,<br><br>        Defendants. | No. |

## I.

## NATURE OF THE CASE

This is a civil rights case arising out of the unnecessary and unconscionable suffering and death of Piper Travis, a 34-year-old woman who was detained for eleven days at the Snohomish County Jail, awaiting trial on misdemeanor allegations.

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 1 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

While in the custody and care of the Defendants, Piper became ill with pneumococcal meningitis, an aggressive, painful, and potentially deadly central nervous system infection. For days, Snohomish County Jail deputies and nurses ignored Piper's pain and suffering. Their inaction was deliberate, inhumane, and cruel. They offered Piper no treatment for her pain. They conducted no meaningful medical or mental health assessment. They collected no background records, history, or information. They identified no probable diagnosis. They simply ignored Piper as she slowly and painfully decompensated before them. Over the course of days, Piper's moaning in pain progressed to yelling, then screaming, then incoherent speech. Piper's writhing on the floor of her cell in agony progressed to an inability to walk, inability to stand, inability to dress herself, inability to talk, and inability to control her bodily functions. Piper's altered mental state progressed from unusual thoughts to confusion, disorientation, then delirium, seizures, foaming at the mouth, and coma. Despite all of these observable symptoms of obvious distress, jail deputies and nurses confided to the medics, who eventually found Piper on the floor of her cell unresponsive, soaked in urine, and foaming at the mouth, that Piper was faking her symptoms or experiencing a "psych" issue.

Defendants were deliberately indifferent to Piper's obvious pain and suffering. Records from the Snohomish County Jail establish that Defendants attributed her obvious medical symptoms to disobedience or non-emergent mental health issues. Instead of providing treatment or care, they acted with disdain and punished her.

Defendant's deliberate indifference to Piper's serious medical need was the direct and proximate cause of days of grievous, unnecessary, and inhumane suffering that preceded her death.

## II.

## PARTIES

2.1    Plaintiff Paulette Beck is a resident of Island County, Washington. She is the Personal Representative of Piper Travis' estate.  Paulette is Piper Travis' biological aunt. Upon the tragic death of Piper's mother (when Piper was 2-years-old), Paulette and her

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 2 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

husband, Greg Beck, became Piper's parents.  Paulette and Greg assumed sole custody of, guardianship over, and all parental duties and responsibilities for Piper. Paulette brings claims individually (along with her husband) and as Personal Representative for the Estate of Piper Travis.

2.2     Piper Travis was a long-time resident of Whidbey Island.  The home she owned and lived in was mere minutes away from her parents' home.  She was 34-years-old when she became critically ill while housed at the Snohomish County Jail on misdemeanor charges.  As a direct result of Defendants' ignoring Piper's serious medical needs, Piper died on December 17, 2017.  At all relevant times, Piper was a citizen of the United States, living in Island County, and as such was entitled to all rights, privileges, and immunities guaranteed under state law, federal law, and the Washington State, and U.S. Constitutions.

2.3     At all material times, defendant Snohomish County was a municipal corporation organized under the laws of the State of Washington, which by and through its agency, the Snohomish County Sheriff's Office ("SCSO"), operated, managed and controlled the Snohomish County "Oakes Street" Jail ("SCJ") and employed, engaged and/or contracted with the remaining named defendants. Snohomish County is a public body responsible under state law for the acts and omissions of its employees, officials, and contractors, including those whose conduct is at issue in this action.

2.4     At all material times, defendant Ty Trenary ("Sheriff Trenary"), who is sued in his official capacity, was employed by Snohomish County as the elected Sheriff for Snohomish County and acting under color of law.  In his role as Snohomish County Sheriff, Defendant Trenary is responsible for the operation, administration, and management of SCSO and SCJ, including formulating and implementing SCSO's policies and procedures, appointing top management, and ensuring that his deputies are properly and adequately trained. Additionally, it is his responsibility to evaluate SCSO employee conduct, investigate allegations of misconduct, and impose discipline when warranted.

2.5     At all material times, defendant Magellan Anderson ("Deputy Anderson") was employed by Snohomish County as a corrections deputy, whose duties and responsibilities

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 3 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

1
2
3

included providing for the custody and care of inmates, including monitoring inmates' mental and physical health. At all relevant times, Deputy Anderson was acting under color of law and within the course and scope of his employment.

4
5
6
7
8

2.6     At all material times, defendant Emerson Yabut ("Deputy Yabut") was employed by Snohomish County as a corrections deputy, whose duties and responsibilities included providing for the custody and care of inmates, including monitoring inmates' mental and physical health. At all relevant times, Deputy Yabut was acting under color of law and within the course and scope of his employment.

9
10
11
12
13
14

2.7     At all material times, defendant Conner Smith ("RN Smith") was licensed in Washington as a registered nurse and employed by Snohomish County as a nurse at SCJ. His duties and responsibilities included performing nursing assignments, conducting "fit-for-jail" assessments, assuring that immediate inmate health care needs are met, and coordinating appropriate follow-up care. At all material times, RN Smith was acting under color of law and within the course and scope of his employment.

15
16
17
18
19
20

2.8     At all material times, defendant Bik-Yee Urban ("RN Urban") was licensed in Washington as a registered nurse and employed by Snohomish County as nurse at SCJ. Her duties and responsibilities included performing nursing assignments, conducting "fit-for-jail" assessments, assuring that immediate inmate health care needs are met, and coordinating appropriate follow-up care. At all material times, RN Urban was acting under color of law and within the course and scope of his employment.

21
22
23
24
25
26

2.9     At all material times, defendant Karin Heusted ("ARNP Heusted") worked as an Advanced Registered Nurse Practitioner employed by Snohomish County at SCJ. Her duties and responsibilities included, in addition to normal nursing duties, acting as a "provider" at the jail, acting as a supervisor, and the responsibility for deciding when an inmate should be transferred to a hospital for medical care.  At all material times, she was acting under color of state law and within the normal course and scope of employment.

27
28

2.10    At all material times, defendant Jason Burns ("MHB Burns") worked as a Mental Health Professional ("MHP") employed by Snohomish County at SCJ. His duties and

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 4 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

1   responsibilities included performing mental health and suicide assessments, placing or
2   removing special watches, assuring that immediate mental health care needs are met, that risk
3   for self-harm is protected against, and coordinating appropriate specialized follow-up care.
4   At all material times, MHP Burns was acting under color of law and within the scope of his
5   employment.

6   2.11   At all material times, Defendant Health Pros Northwest ("HPN"), a for-profit
7   corporation organized and licensed under the laws of the State of Washington, contracted
8   with Snohomish County to provide licensed, qualified, trained, experienced, and otherwise
9   appropriate nursing and healthcare personnel to meet SCJ's supplemental staffing needs. The
10   contract between HPN and Snohomish County assigns HPN the right to direct and control
11   HPN's activities in providing these services.  The contract also required the County to inform
12   HPN of all SCJ policies and procedures.  At all relevant times, RNs Dunham and King were
13   working at SCJ under HPN's contract with Snohomish County.

14   2.12   At all material times, defendant Jeanne Dunham ("RN Dunham") was licensed
15   in Washington as a registered nurse and employed by HPN under its contract with Snohomish
16   County to provide supplemental nursing staff at SCJ.  Her duties and responsibilities included
17   performing nursing assignments at SCJ, conducting "fit-for-jail" assessments, assuring that
18   immediate inmate health care needs are met, and coordinating appropriate follow-up care.
19   At all material times, RN Dunham was acting under color of law and within the course and
20   scope of her employment.

21   2.13   At all material times, defendant Joseph King ("RN King") was licensed in
22   Washington as a registered nurse and employed by HPN under its contract with Snohomish
23   County to provide supplemental nursing staff at SCJ.  His duties and responsibilities included
24   performing nursing assignments at SCJ, conducting "fit-for-jail" assessments, assuring that
25   immediate inmate health care needs are met, and coordinating appropriate follow-up care.
26   At all material times, RN King was acting under color of law and within the course and scope
27   of her employment.

28

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 5 of 21

2.14    Defendant JOHN DOES 1–10 are presently unidentified persons who, while acting under color of state law and within the normal course and scope of employment, were directly or indirectly responsible for the supervision and care of Piper Travis during her incarceration at SCJ between November 20, 2017 and December 1, 2017.

## III.
## JURISDICTION AND VENUE

3.1    This is a civil rights deprivation of rights claim under the scope of 42 U.S. Code § 1983.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

3.2    Venue is appropriate in the Western District of Washington pursuant to 28 U.S.C. § 1391 because Defendant Snohomish County resides in this judicial district and the acts and omissions giving rise to the claims alleged herein occurred in Snohomish County, Washington, within the Western District of Washington.

3.3    Plaintiff Paulette Beck served a Notice of Tort Claim on the Snohomish County Risk Management Office on April 9, 2018 pursuant to RCW 4.92 et seq., and more than the required sixty (60) days has passed without resolution of the claim.

## IV.
## FACTS

**A.    Deliberate Indifference to Piper's Pain, Suffering, and Serious Medical Needs**

4.1    On the afternoon of November 20, 2017, an officer pulled over the car that Piper Travis was riding in because the driver did not have his seat belt on.  When the officer discovered that Piper had some older misdemeanor warrants, she was arrested and booked into the Snohomish County Jail.

4.2    When Piper was booked into SCJ, RN Smith measured Piper's vital signs as follows:

| | |
|---|---|
| Blood pressure sitting | 114/69 |
| Pulse sitting | 87 |
| Respiration | 16 |

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 6 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

| Temperature | 98.2 |
|---|---|
| Blood oxygen saturation | 100 |

Based on this and other information, Jail staff found that Piper was "fit" for booking.

4.3    On the morning of November 21, 2017, Piper made an in-custody court appearance. She pled not guilty to misdemeanor charges and was held on an appearance bond, awaiting trial under the presumption of innocence. During the hearing, Piper conducted herself appropriately, answered questions rationally, and gave no indication whatsoever of illness or medical distress.

4.4    Between November 21 and November 28, SCJ records reveal few entries regarding Piper.  Those entries that do reference her predominantly address how she spent the one hour per day of "rec time" during which she was allowed out of her solitary confinement cell.

4.5    On November 28, as her illness became obvious, Piper began to make regular appearances in SCJ's record keeping system.

4.6    On November 28 at approximately 4:47 a.m., Deputy Munson noticed Piper "crying in her cell." When asked what was wrong, Piper reported that she was suffering from a "terrible headache" with an "uncommon level of pain."

4.7    In response to these observations, Deputy Munson summoned medical staff to visit and evaluate Piper.

4.8    When Defendant Conner Smith ("RN Smith"), a Jail nurse, responded, Piper told him that she did not have a history of migraine headaches and that the pain level was uncommon.  Piper also made the odd comment that the pain may have been the result of "sabotage" by other inmates.

4.9    Despite Piper's irrational thought process and report of an uncommonly painful headache, with no history or injury to explain it, it appears that RN Smith failed to conduct any meaningful medical assessment.  No records were reviewed. No medical history was obtained.  Nothing indicates that RN Smith even bothered to take Piper's vital signs, which consist of clinical measurements of a person's temperature, pulse rate, respiration rate, and

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

1  blood pressure.  Without scheduling any follow-up assessment or treatment and with no plan

2  to check on Piper later, RN Smith simply issued Piper one dose of 400 mg of Ibuprofen and

3  departed.

4       4.10    After RN Smith departed, Deputy Munson noted that, Piper "continued to make

5  noises of pain and anguish for hours." In response to Piper's obvious pain and suffering,

6  Deputy Munson ordered Piper to quiet down.  In SCJ records, Deputy Munson wrote,

7  "I reminded her [Piper] that she is sharing a small living space with 12 other women who are

8  trying to sleep. Noise dropped off considerably for the time being."

9       4.11    Later, on November 28, Ms. Travis "refused" rec time due to her headache.

10  She later declined a meeting with her lawyer and lunch.

11       4.12    On November 28 at 1:18 p.m., Ms. Travis was noted to be "hard to rouse from

12  sleep" when visited by Jail Classifications Officer Leopold.

13       4.13    On November 29 at 7:13 a.m., Defendant Yabut ("Deputy Yabut") noted that

14  Piper was "making strange noises" and was "very slow to process" instructions, which had to

15  be repeated on "numerous" occasions "before she would comply."

16       4.14    Deputy Yabut disciplined Piper by revoking her rec time "due to her incoherent

17  behavior" and "inability to follow instructions."

18       4.15    On November 29 at 3:15 p.m., Defendant Anderson ("Deputy Anderson")

19  noted on a SCJ record that Piper "refused" to return her meal tray. Deputy Anderson

20  interpreted this event as insubordination and disciplined Piper by ordering that she receive

21  sack meals for three days "as a deterrent.  In the same entry, Defendant Anderson noted that

22  Piper "had been moaning sporadically all day."

23       4.16    On November 30 at 6:22 a.m., Deputy Yabut noted that Piper "refused" to eat

24  breakfast.

25       4.17    On November 30 at 6:51 a.m., Deputy Yabut noted that Piper had removed her

26  pants.  He recorded that when she (Piper) "is not sleeping, she is screaming."

27       4.18    On November 30 at 3:00 p.m., Deputy Anderson noted that Piper, "had feces on

28  her hands, her uniform, and upon the wall in her cell." While ordering the disoriented Piper to

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 8 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

disrobe and clean herself, Deputy Anderson noted that she "shuffled aimlessly" and "at a slow speed," seemed to have great difficulty dressing herself, and that she "refused" another visit with her attorney.

4.19   After observing Piper's confusion and inability to read numbers written in large font on a piece of paper, Deputy Anderson callously wrote that, "MAX[imum confinement] is a good place for her."

4.20   On November 30 from 4:00 p.m. through midnight, SCJ's E unit was under the supervision of Deputy Farrell. Despite having access to all of the earlier reports of Piper's distress, Deputy Farrell failed to memorialize anything regarding Piper's behavior or wellbeing, writing that, "[A]ll of the excitement happened on day shift. Nothing significant to report for swing shift. Have a safe night."

4.21   On December 1 at midnight, E unit was turned over to the supervision of Deputy Guerrero, who performed three "welfare/module checks" within the first hour. Deputy Guerrero promptly noticed something seriously wrong with Piper:

> [She] was exhibiting abnormal behavior. Partially unclothed from the waist down. During the first welfare check, I knocked on her cell door and asked her to put her pants on. [Ms.] Travis did not acknowledge me. I knocked on the door several more times, [Ms.] Travis would not look directly at me. Her eyes would sort of roll back halfway, clenched fists, tensed body, shaking, breathing fast, yelling, and incoherent. She looked like she was in pain, but since she wasn't talking. I really did not know where she stood. I know she is incoherent and slow to process directives/information but I had a weird feeling about her well-being.

After making these observations, Deputy Gurerro requested medical attention for Piper.

4.22   On December 1 at 1:15 a.m., Defendant Jeanne Dunham (RN Dunham), a "contract" nurse supplied to SCJ by Health Pros Northwest ("HPN"), responded to E unit to evaluate Piper. RN Dunham noted that Piper was screaming, "urinating on herself," and her cell had the "smell of urine and feces." RN Dunham noted that Piper, "will look at you when you call her name but will not answer."

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 9 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

4.23   RN Dunham failed to take any of Piper's vital signs.  She claims that she "tried" to measure Piper's blood oxygen saturation but was unable to do so because Piper would not "cooperate." In essence, RN Dunham conducted no meaningful medical assessment, conducted no type of records review nor collected any clinical information about Piper.

4.24   On December 1 at 1:29 a.m., RN Dunham departed E unit, leaving her severely ill patient with no plan to follow-up with her or attempt further assessment. Despite observing Piper's alarming symptoms, and despite having access to the earlier reports about Piper's rapidly deteriorating condition, RN Dunham failed to provide Piper any medical treatment.

4.25   On December 1, following her visit with Piper and without conducting any meaningful medical assessment, RN Dunham concluded that Piper's symptoms were behavioral in nature, as opposed to medical. Instead of placing Piper in the jail's medical unit, RN Dunham ordered that deputies transport Piper to the jail's Observation Unit for a "behavioral"—as opposed to a "medical"—watch and scheduled her for an appointment with a Jail Mental Health Provider.

4.26   No attempt was made by RN Dunham to identify, describe, or explain what mental health condition Piper apparently suffered from that would account for the symptoms that she objectively manifested, including suffering from severe pain, inability to walk, inability to talk, seizures, and incontinence. No effort was made to review or obtain a medical or mental health history.  No effort was made to obtain any necessary records or contact any person or entity to gather additional necessary information.

4.27   On December 1, at 2:08 a.m., jail surveillance video shows Deputies Gurerro, Lewis, Mount, and Balentine carrying a non-ambulatory Piper down the E unit stairs to a wheelchair for transport to the Observation Unit. Deputy Gurerro noted that "[t]hroughout this process, [Ms.] Travis continued tensing up her body . . . like she was in pain and she wanted us to be aware of that." Apparently, no one questioned what possible (unnamed) mental health condition caused Piper to lose the ability to walk or stand.

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 10 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

4.28    The "behavioral" watch, which required jail deputies (as opposed to medical professionals) to observe and record their observation of Piper every 30 minutes (on a Special Watch form), began at approximately 2:30 a.m. on December 1:

| TIME | DESCRIPTION OF MS. TRAVIS | BY DEPUTY |
|------|---------------------------|-----------|
| 2:20 a.m. | "Seen by nurse" | [unknown] |
| 2:30 a.m. | "Yelling" | Gomez |
| 3:00 a.m. | "Screamed" | Gomez |
| 3:30 a.m. | "On bunk, appears asleep" | Gomez |
| 4: 00 a.m. | "On bunk, appears asleep" | Gomez |
| 4:30 a.m. | "On floor, yelling" | Standish |
| 5:03 a.m. | "Laying on floor, making noises" | Gomez |
| 5:30 a.m. | "Refused breakfast" | Gomez |
| 6:02 a.m. | "Laying on floor, awake" | Gomez |
| 6:30 a.m. | "Laying on floor, awake" | Gomez |
| 7:00 a.m. | "Laying on floor, awake" | Gomez |
| 7:30 a.m. | "On floor, making noises" | Gomez |

4.29    There are no entries whatsoever on the Special Watch log for the entire eight hour "day shift" from 8:00 a.m. through 4:00 p.m.  No SCJ record provides any explanation for deputies' failures to log or record their observations of Piper for this eight-hour period.

4.30    At 10:30 a.m., Defendant Jason Burns, a Jail mental health professional ("MHP Burns"), visited Piper and described her condition as follows (emphasis added):

[I] observed [her] **writhing on the floor** near the door wearing standard issue jail uniform. [Her] cell was highly malodorous and it appears that [she] urinated on the cell floor. DOD was notified of [the need to cleanup her] cell situation. This writer attempted to interview [her] for 10 minutes however [she] did not respond to attempt to start a conversation. [She] yelled out a few times appearing possibly in pain but did not respond to this writer. [She] made no eye contact with this writer and was staring at the ceiling in her cell. [She] appears

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 11 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

decompensated at this time and it appears that **the 30' watch is necessary to confirm her safety while in custody**. Plan at this time is to continue the 30' watch. [She] will remain in OU until baseline is established or behavior changes. MHP will follow up tomorrow.

4.31    Defendant Bik-Yee Urban ("RN Urban"), a Jail nurse, accompanied MHP Burns during his visit.  RN states that she was unable to take Piper's vital signs during this visit. She did not provide any other medical treatment.  No attempt was made by MHP Burns or RN Urban to identify or explain what mental health condition Piper apparently suffered from that would account for all of the symptoms that she objectively manifested, including suffering from severe pain, inability to walk, inability to talk, and incontinence.  No evidence suggests that either attempted a medical or mental health history, reviewed or attempted to obtain any necessary records, or contacted any person to gather additional necessary information.

4.32    On December 1 at 4:22 p.m., ARNP Heusted scheduled the first medical appointment for Piper.  The appointment was scheduled for December 4th, four days later.

4.33    Entries in the Special Watch Log resumed with the change of shift at 4:00 p.m. (emphasis added):

| TIME | DESCRIPTION OF MS. TRAVIS | DEPUTY |
|------|---------------------------|--------|
| 4:00 p.m. | "Laying on floor" | Rizk |
| 4:40 p.m. | "Moved" | Rizk |
| 5:10 p.m. | "Moved" | Rizk |
| 5:25 p.m. | "Refused dinner" | Rizk |
| 6:05 p.m. | **"On floor, foaming"** | Rizk |
| 6:30 p.m. | **"On floor, foaming** | Rizk |
| 7:00 p.m. | **"On floor, foaming"** | Rizk |
| 7:40 p.m. | [illegible] | [illegible] |
| 8:00 p.m. | **"On floor, foaming"** | Rizk |

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

4.34   At 7:40 p.m. on December 1, RN King memorialized some of Piper's vital signs (for the first time since booking):

| | |
|---|---|
| Blood pressure sitting | 168/77 |
| Pulse sitting | 147 |
| Respiration | 36 |
| Temperature | [blank] |
| Blood oxygen saturation | 88.0% |

4.35   On December 1, at 7:48 p.m., RN King's chart note for Piper indicated that (emphasis added):

> Ms. Travis is **[n]ot responding**, having **rapid eye movements**. **[F]oaming** in her mouth and **hyperventilating**, [and] **has not been eating and drinking for almost 20 hours**. [P]upils round equal and reactive, left eye sensitive to light, **vital[s] elevated**, [she is] **unable to take oral meds and non verbal**.

However, despite knowledge of Piper's vital signs and symptoms, RN neither contacted 911 nor requested paramedics.  Rather, Defendant King called a two-person EMT team to respond to the jail to perform a standard "psych eval" on Ms. Travis.

4.36   In a chart note that she failed to enter until December 6, ARNP Heusted admits that she had been informed by RN King about Piper's concerning condition.  She documented that RN King informed her that Piper had not been eating (or drinking), was not responsive or talking, and had resisted vital signs.  Heusted "ordered" continued observation.  Hours later, RN King again contacted Heusted to inform her that Piper did not look good and that a deputy was "concerned."  Heusted then agreed that RN King could have Piper assessed for transport to the hospital.

4.37   RN King and ARNP Heusted failed to declare a medical emergency for Piper, failed to contact 911, and failed to provide emergency medical care. Instead of contacting paramedics, they placed a non-emergency call to EMTs at 7:58 p.m.

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 13 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

4.38   By declining to declare a medical emergency for Piper, SCJ avoided having their SCJ employees (deputies and medical staff) write an incident report (as would have been required by law and policy).

4.39   On December 1, a two-person EMT team arrived at the Jail. The EMTs noticed that no one at the jail seemed particularly upset or worried about Piper, and no medical staff were present to greet them or provide any medical history or assessment of Piper. Jail employees again informed the EMTs that Piper just needed a "psych eval," and they suggested to the EMTs that Piper was "faking it."

4.40   Upon encountering Piper, the EMTs immediately recognized that she was extremely ill.  They described Piper lying supine on a mattress in her own urine, unresponsive to verbal stimuli and hyperventilating with frothy white sputum around her mouth.  They observed Piper suffering seizure activity, including involuntary movement of her arms and recorded her temperature at 102 degrees.  Jail staff informed the medics that Piper had been in that condition for at least four hours.

4.41   The EMTs decided that Ms. Travis' condition was far too critical to call 911 and wait for paramedics. They decided to immediately transport Ms. Travis to the hospital, using emergency lights and sirens.

4.42   On their paperwork, the EMTs checked the box for "possible neglect" associated with Ms. Travis' condition.

4.43   On December 1 at 8:32 p.m., the EMTs and Ms. Travis arrived at Providence Regional Medical Center Everett, whose medical professionals were again able to measure Ms. Travis' vital signs:

| Blood pressure sitting | 142/92 |
| Pulse | 147 |
| Respiration | 32 |
| Temperature | 101.5 F |
| Blood oxygen saturation | 98.0% |

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 14 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

She was diagnosed with sepsis, meningitis, and acute respiratory distress. They noted: "Distress: severe" and Ms. Travis is "critically ill appearing."

4.44    Doctors heavily dosed Ms. Travis with painkillers and antibiotics, medically inducing a coma that finally relieved her of the pain and suffering inflicted by Defendants' deliberate indifference.

4.45    Defendant's failed to notify anyone from Ms. Travis' family about her circumstances until December 5, 2017, four days after her arrival at the hospital.

4.46    Ms. Travis' family is haunted by the thought of Ms. Travis struggling and suffering alone, first in her cell and then at the hospital, with no loved ones to support her.

4.47    On December 12, 2017, having stabilized her condition but with no brain activity, doctors urged Ms. Travis' family to put her on palliative care and remove life support.

4.48    On December 14, 2017, with no improvement in her condition, Ms. Travis' family agreed.

4.49    On December 15, Ms. Travis underwent music-thanatology therapy. She "responded to lullabies played in the rhythm of her breathing, with a slight decrease in rate and several sighs."

4.50    On December 16, less than one month after being booked into the Snohomish County Jail on misdemeanor charges, Ms. Travis died.

**B.    Deliberate Indifference of Sheriff Trenary, Snohomish County, and HPN Resulting From SCJ's Inadequate Policies, Practices, Customs, and Systemic Deficiencies.**

4.51    There is a long, concerning pattern of inmate deaths at the Snohomish County Jail.  Beginning in 2014, prompted by an unusual number of deaths, SCSO was the focus of a number of reviews and assessments that were highly critical of SCSO's operation and management of SCJ.  These reviews were conducted by the Pierce County Sheriff's Office, the National Institute of Corrections ("NIC"), and a consultant hired by SCSO.  The reviews

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 15 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

resulted in a number of recommendations to Sheriff Trenary and SCSO that were necessary in order to bring their operations up to a constitutionally sufficient level.

4.52    In August 2013, Pierce County officials met with SCJ officials to discuss their review and assessment of SCJ's operations.  The minutes from the meeting reveal that Pierce County officials warned Snohomish County, in part, that: "There are no intervention efforts being undertaken or conducted.  A common fallback to accommodate shortfalls for staffing and care is that the inmate is tagged as "feigning" their need for care.  This then becomes part of the "culture" as is the case for the [SCJ].

4.53    Over the last few years, Snohomish County has faced an uncommon number of lawsuits arising from their repeated deliberate indifference to the medical and mental health needs of the inmates housed at SCJ.  Reports from numerous experts have been provided to Sheriff Trenary and SCJ administration that identify the clear need for increased employee accountability, additional training, and improved policy and procedure.  The lawsuits have identified a clear pattern or series of incidents of deliberate indifference to inmates' serious medical and mental health needs.   Although the lawsuits have resulted in numerous costly settlements that have required Snohomish County and those persons it contracts with to pay millions of dollars, Sheriff Trenary and his SCJ administration have failed to address their deficiencies.

4.54    In purposeful defiance of the damning conclusions of the formal reviews and assessments, and of the hefty settlement figures, Sheriff Trenary and his selected SCJ administrators have consistently ratified the actions of SCJ employees who violate the constitutional rights of inmates. Sheriff Trenary fails to discipline SCJ employees' deliberate indifference to an inmate's serious medical or mental health need. This continual ratification has sent a clear message to SCJ employees that their actions are beyond meaningful review and accountability.  Sheriff Trenary's failure of leadership and accountability has created an institutional culture that not only tolerates, but supports, ignoring and doubting inmates' serious medical needs and actively obstructs the provision of adequate medical care.

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 16 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

4.55   In the present case, Sheriff Trenary not only failed to discipline anyone for what happened to Piper, he has taken his culture of ratifying constitutional violations to a new low. He has regressed from simply ignoring the conclusions of formal reviews of his employees' actions to, now, refusing to conduct any review at all. He relies on the fact that SCJ transported a comatose and unresponsive Piper Travis to the hospital before she died to support his position that no investigation into the actions of his employees or circumstances surrounding her death is warranted or necessary.

4.56   To date, no investigation (death, internal, or otherwise) has been conducted into the circumstances leading to Piper's death.  Snohomish County has steadfastly ignored Plaintiff's (and her attorneys') request for any type of investigation.  This refusal to investigate has been coupled with  SCSO failing to timely respond to Plaintiff's public records requests.  For example, nearly one year ago, Plaintiff submitted a request for jail surveillance video depicting Piper while she was housed at SCJ.  To date, SCSO has failed to produce a single video clip of Piper Travis to Plaintiff, asserting that all of the video is confidential and claiming that they  are still working on necessary "redactions" of the video.

4.57   Sheriff Trenary's refusal to investigate his employees' actions relating to Piper's death is a cagey and self-serving attempt to avoid knowledge of his employees' actions, inactions, and failings.   His failure to investigate, supervise, and impose accountability constitutes an institutional and official deliberate indifference to inmates' rights

4.58   The circumstances of this case evidence a continued pattern and practice of inmates' serious medical needs being ignored as a result of an accepted custom and culture of SCJ employees' assuming that inmates are faking or feigning their medical or mental health symptoms.

4.59   Sheriff Trenary and Snohomish County continue to operate the SCJ with inadequate policy and procedure.  For example, at the time of Piper Travis's death, nothing indicates that there was policy, procedure, or training related to how frequently an inmate's vital signs must be taken, what steps a medical provider should take if any inmate refuses to

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 17 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

have his/her vital signs taken, and/or recording or tracking an inmate's intake of food and fluids.

4.60    According to the contract between Snohomish County and HPN, HPN adopted and/or ratified all SCJ policies, practices, and procedures (or lack thereof).  HPN agreed to be informed of SCJ policy and procedure.  It also agreed that its employees would operate under existing SCJ policy and procedure while working at SCJ.

**V.**

**FIRST CAUSE OF ACTION:  SECTION 1983 –**
**FOURTEENTH AMENDMENT VIOLATION – DELIBERATE**
**INDIFFERENCE TO PIPER TRAVIS'S SERIOUS MEDICAL NEED**

5.1    Jail inmates have the constitutional right to receive and access adequate health care.  The rights of pretrial detainees, such as Piper Travis, emanate from the Due Process Clause of the Fourteenth Amendment.

5.2    By virtue of the facts set forth above, the Defendants violated Piper Travis's federally-protected rights by their deliberate indifference to her pain, suffering, and serious medical need.  As a direct and proximate result of the defendants' deliberate indifference to Piper's constitutional rights, Piper suffered gruesome pre-death pain, suffering, terror, and anxiety, in an amount to be proven at trial.

5.3    By virtue of the facts set forth above, Defendant Snohomish County and its agents and employees and Defendant Trenary interfered with, obstructed, and otherwise deprived Piper Travis of her constitutionally protected Civil Rights, including, but not limited to, the violation of Piper's right to due process and equal protection of the laws protecting those similarly situated as her, including her liberty interests and protection of her life; the violation of Piper's right against cruel and unusual punishment and for the deliberate indifference to Piper's right to reasonable, effective, and prompt medical care and treatment.

5.4    By virtue of the facts set forth above, Defendant Snohomish County was aware of the inadequate medical care SCJ was providing to its inmates and failed to adequately train, supervise, and hold accountable its employees with regard to the conduct described

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 18 of 21

**FRIEDMAN | RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

herein.   Defendant Snohomish County deprived Piper Travis of her civil rights and her entitlement to equal protection of the law via its lack of training, policies, and procedures, which have directly led to multiple deaths at the Snohomish County Jail, including but not limited to deliberate indifference, lack of proper observation, missed watches, lack of medical screening, and lack of necessary medical treatment, all in violation of 42 U.S.C. § 1983.

5.5     Additionally, by virtue of the facts set forth above, the Defendants are liable for compensatory and punitive damages for deprivation of the civil rights of Piper Travis guaranteed by the Fourteenth Amendment to the Constitution and 42 U.S.C. § 1983 to be free from deprivation of life without due process of law.

## VI.

### SECOND CAUSE OF ACTION:  SECTION 1983 CIVIL RIGHTS VIOLATION FOURTEENTH AMENDMENT RIGHTS – LOSS OF PARENT CHILD RELATIONSHIP

6.1     Parents have long been recognized as having standing to sue for their own losses associated with the wrongful death of a child by officials under 42 USC 1983.  Parents have a constitutionally protected liberty interest under the Fourteenth Amendment in the love, companionship and relationship with their child.

6.2     By virtue of the facts set forth above, the Defendants, through their deliberate indifference, caused Plaintiffs Paulette and Gregory Beck, who became Piper's parents at the age of two and remained her parents until her death, to be deprived of their constitutional right to love, society and companionship with their daughter, Piper, for which they are entitled to compensatory and punitive damages in an amount to be proved at trial.

## VII.

### THIRD CAUSE OF ACTION – STATE LAW CLAIM - OUTRAGE (State Law Claim – Outrage)

7.1     By virtue of the facts set forth above, Defendant Snohomish County and Defendant Trenary are liable to the Plaintiffs for the tort of outrage because of the extreme and outrageous actions of its employees who failed to notify Piper's family of her medical

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 19 of 21

FRIEDMAN | RUBIN® PLLP
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

emergency and/or transport to Providence Hospital.  Piper's parents are haunted by the image of their daughter alone in her hospital room.  For days, they were  prevented from being with their dying daughter. They were deprived of the chance to comfort her.    They were denied any chance  to advocate for her health care needs.  They were denied any opportunity to provide relevant information regarding her medical background.  Worst yet, they were deprived of their final  moments with Piper.  They are outraged by the actions of SCJ that led to their daughter being all alone, fighting for her life because no one at SCJ made any attempt to contact them.

## VIII.
## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request relief against Defendants as follows:

1.    Fashioning an appropriate remedy awarding Plaintiffs general and special damages including damages for pain, suffering, terror, and loss of parental relationship pursuant to § 1983 and 1988 and any applicable Washington law;

2.    Punitive damages from the individual, non-municipal, Defendants to the extent authorized by law in an amount to be proven at trial;

3.    Awarding Plaintiffs reasonable attorney's fees and costs, under 42 U.S.C. § 1988 and to the extent otherwise permitted by law; and

4.    Such other relief as may be just and equitable.

DATED this 18th day of December 2018.

FRIEDMAN│RUBIN® PLLP
Attorneys for Plaintiffs

*Cheryl L. Snow*

By:_____
Cheryl Snow, WSBA #26757
csnow@friedmanrubin.com
51 University Street, Suite 201
Seattle, WA  98101

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 20 of 21

**FRIEDMAN│RUBIN® PLLP**
51 University Street, Suite 201
Seattle, WA  98101
P: (206) 501-4447 ~ F: (206) 623-0794

Phone:  (206) 501-4446
Fax:  (206) 623-0794


MAZZONE LAW FIRM, PLLC
Attorneys for Plaintiffs

*Cheryl L. Snow*

By:_____
For:      Braden Pence, WSBA #43495
               bradenp@mazzonelaw.com
          James Herr, WSBA #49811
               jamesh@mazzonelaw.com
          Peter Mazzone, WSBA #25262
               peterm@mhb.com
          3002 Colby Avenue, Suite 302
          Everett, WA  98201
          Phone:  (425) 259-4989
          Fax:  (425) 259-5994

COMPLAINT
*Beck, et al. v. Snohomish County, et al., Case No. _____*
Page 21 of 21